# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **FABRIZIO BISETTI,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | **No. A-19-CV-00616-DH** |
| **CITY OF AUSTIN, TEXAS; AND** | § | |
| **OFFICER BRENDAN** | § | |
| **MCMORROW, AUSTIN POLICE** | § | |
| **DEPARTMENT;** | § | |
| *Defendants* | § | |

## ORDER

Before the Court are the motions for summary judgment filed by Defendant City of Austin, Dkt. 85, and Defendant Brendan McMorrow, Dkts. 86, 96, and the motion to strike filed by McMorrow, Dkt. 99; and all related briefing. Having considered the parties' arguments, the evidence, and the relevant law, the Court will deny Officer McMorrow's motion for summary judgment and grant the City's.

## I.     BACKGROUND

Plaintiff Fabrizio Bisetti initiated this lawsuit following his arrest by Defendant Brendan McMorrow, an officer with the Austin Police Department, for assault with injury-family violence. Dkts. 68; 85-3. Bisetti claims that the arrest violated his constitutional rights because it was made without probable cause based on APD's alleged policy of requiring officers to arrest anyone accused of domestic violence, even where there is no probable cause for an arrest. Dkt. 68, at 7-8. Bisetti brought two causes of action against Defendants McMorrow and the City of Austin

1

under 42 U.S.C. § 1983 for false arrest and wrongful institution of legal process in violation of the Fourth Amendment. *Id.*

Bisetti originally contacted the police on the morning of his arrest when his wife, Begum Guvenc, did not return home after attending synagogue and failed to pick up their children from day care. Dkts. 85-1, at 64-69; 85-3, at 3. After locating the family's car at an apartment complex, Bisetti called the police to help him locate his wife. Dkts. 95-1, at 74-75; 85-3, at 3. Officer McMorrow responded to Bisetti's call and helped him find the apartment where Guvenc was located. Dkts. 85-2, at 70-72; 85-3, at 3. Guvenc was asleep in the apartment, and when awakened, appeared to be "extremely intoxicated." Dkts. 85-2, at 72-74; 85-3, at 3 (reporting that Guvenc "appeared to be extremely intoxicated with red, bloodshot, watery eyes, slurred speech, and an odor of a metabolized alcoholic beverage emitting from her breath, and appearing to be very unsteady on her feet."); 90-4, at 19 ("In my police-investigative opinion, I believe she was intoxicated.").

Guvenc's friend indicated that she had drunk too much alcohol and had "passed out" at his apartment in the complex, though Guvenc claimed she had food poisoning. Dkts. 85-1, at 84; 85-2, at 67; 85-3, at 3. McMorrow testified that he did not find Guvenc's claim that she had food poisoning from a hot dog to be credible because she smelled of alcohol, and her friend had already told him she had drunk too much alcohol. Dkts. 85-2, at 67; 90-4, at 17-19 ("[i]t's not possible that what I observed was not due to alcohol"). Bisetti appeared relieved that his wife was safe, and took her

2

home, while Guvenc seemed "very frustrated that he would have called 911 for this." Dkts. 85-2, at 77; 85-3, at 3.

Later that same morning, Guvenc contacted the police after the couple got into an argument over the prior call to the police. Dkts. 83-3, at 3; 95-2, at 81. When police arrived at the couple's home, Bisetti was sitting on the front porch of the house and Guvenc was inside. Dkt. 90-6, at 8. Bisetti told the officer that the couple had been fighting over the earlier interaction with police, and Guvenc had threatened to call her mother. Dkt. 90-6, at 8-9. Bisetti then took the phone from Guvenc's hands and held it out of her reach. Dkt. 90-6, at 8-9. When he "realized that this was getting out of hand," he put the phone down, and left the house to take a walk and get some air Dkt. 90-6, at 8-9. When he returned from the walk, the doors of his home were locked, and he could hear his wife calling the police. Dkt. 90-6, at 8-9. Bisetti waited outside the house until the police arrived. Dkt. 90-6, at 8-9.

When police spoke with Guvenc, she similarly told them the couple had been fighting about the previous 911 call and how it might affect her custody over the children. Dkts. 90-4, at 10-11; 90-6, at 8-9. However, Guvenc told the police that as Bisetti was holding the phone out of her reach, he hit her on the right cheek with the back of his closed fist, which she said caused her pain. Dkts. 90-4, at 11; 90-6, at 9. Guvenc also told McMorrow that Bisetti had strangled her a couple of months earlier on New Year's Eve. Dkt. 32, at 7. McMorrow wrote in his police report that while "there was some very slight redness to the right cheek area," Guvenc had been "pressing on it rather firmly" to show him the injury though "this did not seem to

cause her further pain and could have also contributed to the slight redness I observed." Dkts. 90-4, at 12 ("I believe [her cheek] got a little red after the bag of frozen peas were on it"); 90-6, at 9. Guvenc also expressed concern that the earlier call to the police could impact her ability to gain custody over her children in the future. Dkts. 90-6, at 9; 90-8, at 17-18 ("I felt more as though … this was a calculated response to his 911 call earlier, almost like a tit for tat to build up a case for later").

Based on Guvenc's allegation that Bisetti struck her in the face, McMorrow placed Bisetti under arrest. Dkt. 90-6, at 9. McMorrow stated in the affidavit in support of Bisetti's arrest that Guvenc asserted that at some point while withholding her phone Bisettti had "struck her on her right cheek using the back of his closed fist causing her pain," and noted that "there was some minor redness to the right cheek area." Dkt. 85-3, at 3. McMorrow later testified at the couple's divorce proceeding that he did not believe an assault took place on the day Bisetti was arrested because he "didn't see any evidence of it" and "she seemed to tell me [a] story not indicative of most victims of assault." Dkt. 90-4, at 10-12, 14-15; 90-9, at 46.

McMorrow testified that he only arrested Bisetti because he believed he "didn't have a choice" under the APD family violence policy, which he believed required him to make an arrest "whenever there is an accusation of family-violence assault." Dkt, 90-4, at 13. McMorrow further testified that he believed he could not include anything Bisetti had told him in his arrest affidavit unless "it help[ed] go towards probable cause." Dkt. 90-9, at 41. McMorrow stated he would not have arrested Bisetti absent his understanding that he was required to do so under APD policy. Dkt, 90-4, at 13.

APD police chief Brian Manley testified that if McMorrow "did not believe the assault had occurred, then he should not have filled out a [probable cause] affidavit saying an assault occurred and signed it" because "[i]f an assault didn't occur, there can't be probable cause for an assault." Dkt. 90-5, at 32, 40. McMorrow testified that he did not receive any further training after arresting Bisetti under the APD family violence policy. Dkt. 90-9, at 33.

## II.      LEGAL STANDARDS

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III.      MOTION FOR SUMMARY JUDGMENT

### A.      McMorrow's Motions for Summary Judgment

McMorrow asserts three bases for summary judgment: (1) qualified immunity; (2) damages; and (3) statute of limitations. The Court addresses each in turn.

#### 1.      Qualified immunity

Bisetti's amended complaint asserts claims against McMorrow for violations of his Fourth Amendment rights in connection with his alleged false arrest and wrongful institution of legal process (also referred to as malicious prosecution). Dkt. 68, at 6-7. McMorrow moves for summary judgment on these claims, arguing that his

conduct did not violate the Fourth Amendment in the first place, but, in any event, qualified immunity shields him from liability for Bisetti's claims because his conduct did not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. Dkts. 32, at 13-18; 96, at 6-24.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even when considering a qualified immunity defense, however, the Court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmoving party's favor. *Rosado v. Deters*, 5 F.3d 119, 122-23 (5th Cir. 1993). It may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In the context of a pretrial motion, the applicable standard of review limits the Court's ability to conclusively determine whether an officer is entitled to qualified immunity. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (holding that at summary judgment, a court cannot resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party).

"Whether an official's conduct was objectively reasonable [in light of the law that was clearly established at the time of the disputed action] is a question of law for the court, not a matter of fact for the jury." *Brown*, 623 F.3d at 253. But "in certain circumstances where 'there remain disputed issues of material fact relative to

7

immunity, the jury, properly instructed, may decide the question.'" *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (quoting *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993)); *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000). As explained below, fact questions surrounding Bisetti's arrest preclude McMorrow's summary judgment motion here.

### a.    The qualified-immunity framework

The doctrine of qualified immunity protects public officials from suit and liability for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). Thus, in determining qualified immunity, courts engage in a two-step analysis: (1) was a statutory or constitutional right violated on the facts alleged; and (2) did the officer's actions violate clearly established statutory or constitutional rights of which a reasonable person would have known? *Id.* at 623-24. The two steps of the qualified immunity inquiry may be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the Fifth Circuit has already concluded "that the Fourth Amendment is the appropriate constitutional basis for [a] claim that [a plaintiff] was wrongfully arrested due to the knowing or reckless misstatements and omissions in [a defendant officer's] affidavits,"[1] the Court will focus its inquiry on the second step.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation mark omitted). This rule

---

[1] *Winfrey v. Rogers*, 901 F.3d 483, 492 (5th Cir. 2018).

"do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 743. It likewise "shields an officer from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [the officer] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost." *Id.* at 344-45.

An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the

conduct." *Brosseau*, 543 U.S. at 198. "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019).

The Supreme Court has cautioned courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Id.* (emphasis added). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (internal quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (cleaned up). The conclusion that a violation occurred must "follow immediately" from the clearly established principle. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "The plaintiff has the burden to point out clearly established law." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021).

When evaluating a qualified immunity defense, courts "consider only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam); *see also Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) (en banc) ("[W]e consider only what the officers knew at the time of their challenged conduct."). "Facts [that] an officer learns after the incident ends—whether those facts

10

would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam); *Brown*, 623 F.3d at 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight."). Moreover, the officer's "subjective beliefs about the [action] are irrelevant." *Anderson*, 483 U.S. at 641. The relevant inquiry at this point is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [McMorrow's actions] to be lawful, in light of clearly established law and the information [McMorrow] possessed." *Id.* And "even if [McMorrow] felt that probable cause was lacking, an objective standard would still be applicable." *United States v. Clark*, 559 F.2d 420, 425 (5th Cir. 1977)

> b.   The clearly established law applicable to Bisetti's Fourth Amendment claims against McMorrow

At issue here is the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "A warrantless arrest must be based on 'probable cause.'" *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). An arrest made without probable cause—*i.e.*, a false arrest—violates this constitutional right. *Deville*, 567 F.3d at 166 ("There is no doubt that it was clearly established in August 2005 that an arrest is unlawful unless it is supported by probable cause." (cleaned up)). Likewise, although there is no "freestanding constitutional right to be free from malicious prosecution," "[t]he initiation of criminal charges without

11

probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example." *Castellano v. Fragozo*, 352 F.3d 939, 945, 953 (5th Cir. 2003) (en banc).

Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Probable cause is a "practical and common-sensical standard." *Florida v. Harris*, 568 U.S. 237, 244 (2013). It looks to the "totality of the circumstances" to determine whether the magistrate with "the facts available to [him] would 'warrant a [person] of reasonable caution in the belief'" to find that the suspect committed the crime for which he is being arrested. *Id.* at 243. "If there was probable cause for any of the charges made ... then the arrest was supported by probable cause, and the claim for false arrest fails." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995). "An officer may conduct a warrantless arrest based on probable cause that an individual has committed even a minor offense, including misdemeanors." *Deville*, 567 F.3d at 165 (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).

But as the Fifth Circuit recognized in *Winfrey*:

> Since *Franks v. Delaware*, 438 U.S. 154 (1978), it has also been clearly established that a criminal defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes "a false statement knowingly and intentionally, or with reckless disregard for the truth" and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56, 98 S.Ct. 2674. In *Franks*, the Supreme Court observed that the warrant requirement is meant "to allow the magistrate to make an independent evaluation of the matter." *Id.* at 165, 98 S.Ct. 2674. It requires affiants to "set forth particular facts and circumstances underlying the existence of probable cause," including those that concern the reliability of the information and the

credibility of the source to avoid "deliberately or reckless false statement[s]." *Id.*

901 F.3d at 494. Thus, there are two prongs the plaintiff must prove to establish a *Franks* violation.

First, the plaintiff "must present evidence that [the officer], through material omissions or otherwise, made 'a false statement knowingly and intentionally, or with reckless disregard for the truth.'" *Id.* (quoting *Franks*, 438 U.S. at 155). "[N]egligence alone will not defeat qualified immunity." *Brewer v. Hayne*, 860 F.3d 819, 825 (5th Cir. 2017). "[A] proven misstatement can vitiate an affidavit only if it is established that the misstatement was the product 'of deliberate falsehood or of reckless disregard for the truth.'" *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (quoting *Franks*, 438 U.S. at 171). Recklessness requires proof that the defendant "'in fact entertained serious doubts as to the truth' of the statement." *Hart v. O'Brien*, 127 F.3d 424, 449 (5th Cir. 1997) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)), *abrogation on other grounds recognized by Spivey v. Robertson*, 197 F.3d 772, 775 (5th Cir. 1999).

Second, the Court must resolve whether "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 156. To make this determination, *Franks* requires the Court to consider a hypothetical "corrected affidavit" in which the alleged errors were removed and omissions replaced. The Court examines the corrected affidavit to determine "whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions." *Winfrey*, 901 F.3d at 495 (citing *Franks*, 438 U.S. at 156); *see also, e.g.,*

*United States v. Bankston*, 182 F.3d 296, 305-06 (5th Cir. 1999) (using a corrected affidavit that "contain[ed] the allegedly exculpatory conversation" to determine whether that affidavit would establish probable cause to authorize electronic surveillance)), *overruled on other grounds by Cleveland v. United States*, 531 U.S. 12 (2000). The warrant will be valid only if the corrected affidavit establishes probable cause for the complained-of arrest.

        c.    Application of the clearly established law to the specific context of this case

McMorrow's affidavit, provided the same day as Bisetti's arrest, begins by stating that he had good reason to believe and did believe that Bisetti committed the offense of "ASSAULT WITH INJURY – Family Violence." Dkt. 85-3, at 3. He then states that this was based on his belief that "On March l0, 2018 at approximately 4:45 AM, an assault was committed against Guvenc, Begum, by Bisetti, Fabrizio." *Id.* In the narrative that follows, McMorrow describes his initial contact with Bisetti and his wife Guvenc after Bisetti had called expressing his concern that something had happened to her, and that he thought she was at a friend's (Christopher Aguero) apartment because he saw her car there. *Id.* McMorrow explains he and Bisetti knocked on Aguero's door; Aguero told them she had "drank too much" and "passed out" there; that Aguero woke her; and that "she did appear to be extremely intoxicated with red, bloodshot, watery eyes, slurred speech, an odor of a metabolized alcoholic beverage emitting from her breath and appearing to be very unsteady on her feet." *Id.* McMorrow states Bisetti then took her home. *Id.*

McMorrow then describes his next encounter with Bisetti and Guvenc, in response to a subsequent call from their residence, which led to Bisetti's arrest:

> When we made contact again on the present call, Bisetti informed me that his wife has been getting increasingly angry as the night progressed over the fact that he called 911 earlier. She was worried that this was going to affect her custody of the children in a possible upcoming divorce, due to the fact that she got drunk and passed out and therefore never picked up the children from day care as planned. Bisetti stated that she has been arguing with him about this since we last saw them, growing increasingly irate. He stated that at one point she grabbed her phone and threatened to call her mother to tell her what he had done. Bisetti believed that this would be an unnecessary embarrassment and would be better left between just them to handle. He stated that he took the phone from her hands and attempted to hold it out of her reach. He stated that he realized that this was getting out of hand and eventually put the phone down, left the house, and took a walk to get some air. When he returned home a little while later the doors were locked and he could hear her on the phone calling 911. He was still waiting outside when we arrived.
>
> I then spoke to Guvenc who told me a very similar story. However, she stated that at one point when attempting to keep her phone from her, he struck her on her right cheek using the back of his closed fist causing her pain. There was some minor redness to the right cheek area. She alleged no other injuries, assaults, or threats. Their three children, 1 boy 9 y/o, 1 boy 7 y/o, and one girl, 4 y/o, were home, but asleep upstairs and not present for the incident.

*Id.*

The elements for the offense of assault involving family violence requires proof that the defendant intentionally, knowingly, or recklessly caused bodily injury to a person with whom the defendant had a relationship. Tex. Penal Code § 22.01(a)(1). "Bodily injury" means physical pain, illness, or any impairment of physical condition. *Id.*, § 1.07(a)(8). The Court concludes that probable cause for this crime is established on the face of this affidavit.

But that does not end the Court's inquiry. Bisetti contends that McMorrow's affidavit misled the magistrate to conclude that probable cause existed. Therefore, pursuant to *Franks*, the Court must determine whether McMorrow's probable cause affidavit: (1) contained material omissions or false statements made knowingly and intentionally or with reckless disregard for the truth; and (2) if corrected to tell the whole story, would establish probable cause existed for Bisetti's arrest. Bisetti argues that McMorrow's affidavit fails both prongs.

Bisetti contends McMorrow's affidavit contains two affirmatively false statements: (1) that McMorrow believed that Bisetti committed the offense of assault with injury – family violence; and (2) that he believed Bisetti assaulted Guvenc. *See* Dkt. 97, at 6. To demonstrate the alleged falsity of these statements, Bisetti relies on McMorrow's subsequent deposition and court testimony that he "did not believe Guvenc's story, and only arrested Bisetti due to the APD policy requiring him to do so," *id.* (citing Dkt. 90-9, at 49), and points to his testimony that "'[O]verall, I didn't find her [Guvenc] to be a credible person, and I thought that the information that she was giving me could be in response to' Bisetti's earlier 911 call," *id.* (quoting Dkt. 90-9, at 50). Bisetti goes on to enumerate the following alleged material omissions:

1. That McMorrow believed Guvenc had concocted the allegation of assault as a "tit for tat" allegation in her plan to challenge custody of the couple's children;

2. That Guvenc appeared to McMorrow not to be a credible witness;

3. That Bisetti appeared to McMorrow to be a credible witness whose demeanor conflicted with Guvenc's claims;

16

4. That Guvenc struck herself in the face and pressed the bag of peas on it which caused "slight redness" eventually observed on her cheek;

5. That McMorrow did not observe any redness or injury on Guvenc's face until after she had been striking herself and pressing her face with frozen peas;

6. That Guvenc pressing on her cheek (where she alleged she was hit) did not appear to McMorrow to cause Guvenc pain;

7. That McMorrow had just left the couple from the prior 911 call 82 minutes earlier;

8. That Guvenc lied about her intoxication during McMorrow's response to the earlier 911 call, instead claiming she had food poisoning;

9. That McMorrow was only making an arrest due to the unconstitutional APD policy; and,

10. That McMorrow did not see any evidence that Bisetti had assaulted Guvenc and McMorrow did not believe an assault occurred.

*Id.* at 6-7.

Under the first prong of the *Franks* analysis, the Court must determine whether under clearly established law, applied to the specific context of this case, McMorrow's affidavit was false or made with reckless disregard for the truth. Under the Fifth Circuit's decision in *Hart*, that determination here turns on whether McMorrow "in fact entertained serious doubts as to the truth of the statement." 127 F.3d at 449. The Court concludes that McMorrow's testimony alone is at least some evidence that he did indeed harbor serious doubts about the probable cause to arrest Bisetti—enough, at least, to survive summary judgment.[2] *See, e.g., Melton v. Phillips*,

---

[2] McMorrow moved to strike various statements from a declaration Bisetti's expert, Jeff Noble, which Bisetti cited in his summary judgment response. Dkt. 99. Because that evidence

837 F.3d 502, 509 (5th Cir. 2016), *overturned on reh'g en banc on other grounds*, 875 F.3d 256 (5th Cir. 2017) ("Whether a defendant in fact entertained serious doubts as to the truth is necessarily a fact question."); *see also, e.g.*, *Winfrey*, 901 F.3d at 494 (reversing and remaining after finding a fact issue on the first *Franks* prong).

The Court likewise concludes that Bisetti has successfully created a fact issue with respect to the second *Franks* prong. Even after setting aside the objected-to evidence from Bisetti's expert, the Court cannot conclude as a matter of law that if the omissions identified by Bisetti were included in McMorrow's affidavit, that a reasonable magistrate would have found probable cause for Bisetti's arrest. Bisetti's evidence at least creates an issue of material fact on this issue as well.

Finally, McMorrow contends that even if the affidavit did not show probable cause for assault involving family violence, it still shows probable cause for assault by offensive contact. Dkt. 96, at 22. But the same fact issues regarding his serious doubts as to the truth of the allegations are present regardless of the nature of the assault charged. Accordingly, the Court denies McMorrow's motion for summary judgment on the basis of qualified immunity.

### 2.    Damages

As his second basis for summary judgment, McMorrow argues that Bisetti cannot demonstrate that McMorrow's alleged wrongdoing proximately caused the damages Bisetti seeks. Dkt. 32, at 18-20. In particular, McMorrow argues that Bisetti has no evidence (1) that McMorrow's alleged wrongdoing was the cause-in-fact of

---

did not factor into the Court's conclusion here, the Court dismisses McMorrow's motion as moot.

Guvenc's fleeing the country with their children; and (2) that McMorrow acted with the intent necessary to allow punitive damages.

a.    Proximate cause

To show a lack of evidence of proximate cause, McMorrow notes that Bisetti admitted (1) that neither he nor Guvenc told McMorrow of any concerns about her leaving the country with the children, Dkt. 32, at 19 (citing Dkt. 32-6, at 12); (2) that prior to the incidents giving rise to this case, Guvenc had never mentioned fleeing the country, *id.* (citing Dkt. 32-6, at 9); (3) that while Guvenc discussed custody issues, she never mentioned going back to Turkey with the children, and that the thought did not occur to him the night of the incident, *id.* (citing Dkt. 32-6, at 10); (4) that Bisetti himself thought it was completely unforeseeable that Guvenc would leave the country with the children, *id.* (citing Dkt. 32-6, at 10); and (5) that her act of taking the children out of the country was an intentional act, *id.* (citing Dkt. 32-6, at 13, 14). Pointing to this evidence, McMorrow argues that Guvenc's fleeing to Turkey with their children was an intentional, superseding act that broke the causal chain, and that, in any event, her fleeing, and the subsequent damages Bisetti incurred in attempting to regain custody of the children, could not have been foreseeable to McMorrow as a possible result of his alleged wrongdoing. *Id.*

At the outset, Bisetti responds that "[g]enerally, 'issues of proximate causation and superseding cause involve application of law to fact, which is left to the fact finder.'" Dkt. 97, at 24 (quoting *Exxon Co. v. Sofec*, 517 U.S. 830, 840-41 (1996)). Arguing that Guvenc's fleeing with the children was foreseeable to McMorrow, Bisetti

19

points to her repeated references the couple's impending custody dispute; McMorrow's admission that the custody dispute was at the heart of the couple's disagreement; and McMorrow's admission that it is foreseeable that one parent will lose custody of children when there is a custody dispute. *Id.* at 25 (citing Dkts. 90-10; 90-9, at 51, 68). Bisetti also cites Texas case law demonstrating that parents can lose custody of their children after an arrest. *Id.* at 25-26 (collecting cases). Based on this Bisetti contends that a jury could conclude that the general character of the injury Bisetti suffered—*i.e.*, losing custody of his children as a result of his arrest—was foreseeable, and thus summary judgment is not appropriate on this point. *Id.* at 26. As for McMorrow's argument that Guvenc's criminal act of kidnapping was a superseding cause, Bisetti notes that there is at least a fact question regarding whether her criminal act was foreseeable. *Id.* at 26-27. Bisetti closes by noting that McMorrow's motion only attacks the damages Bisetti seeks in connection with regaining custody of his children, but that Bisetti also seeks mental anguish damages, attorneys' fees incurred in his criminal defense, and other consequential damages that are not related to Guvenc's fleeing with their children. *Id.* at 27.

The Court agrees with Bisetti that a fact question exists regarding the foreseeability of Guvenc's actions following his arrest, and that their criminal character is not a superseding cause as a matter of law. While Bisetti's evidence of foreseeability may not ultimately carry the day at trial, the Court concludes that Bisetti has met his burden to demonstrate a material issue of fact on this point.

b.      Punitive damages

Punitive damages are available in a § 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). McMorrow argues that Bisetti has no evidence of such an intent. Dkt. 32, at 20. McMorrow points to his own testimony that he did not dislike Bisetti, or want to punish him, and he cites testimony from Bisetti himself stating he did not believe McMorrow bore any ill will toward him and did not believe McMorrow arrested him out of spite. *Id.* (citing Dkt. 32-6, at 17-20). Rather than respond with specific evidence creating a fact issue on this point, Bisetti directs the Court to his previous arguments and mentions McMorrow's alleged admission that he did not believe that an assault occurred and that he had no evidence of an assault. Dkt. 97, at 27.

Having concluded that there is a fact issue regarding whether McMorrow's conduct amounted to a "reckless disregard" for the truth, *supra* Part III.A.1.c, the Court likewise concludes that a jury could reasonably conclude that McMorrow's conduct satisfies the standard for punitive damages as articulated in *Smith*. *See Brown v. Byer*, 870 F.2d 975, 982 (5th Cir. 1989) (upholding punitive damages jury award in § 1983 case involving alleged false probable cause affidavit).

3.      Statute of limitations

Finally, McMorrow argues that a two-year statute of limitations bars Bisetti's claim for malicious prosecution. Dkt. 96, at 3-6. McMorrow contends that Bisetti's

claim accrued on August 29, 2018, the date the criminal charges against him were dismissed; that Bisetti therefore had to assert his malicious prosecution claim by August 29, 2020; and that his October 2021 amended complaint, which McMorrow contends is the first time Bisetti asserted this claim, was untimely. Dkt. 96, at 4. The parties do not dispute when Bisetti's claim accrued or that Texas's two-year statute of limitations for general personal injury claims applies here. But the parties do dispute when Bisetti first asserted his malicious prosecution claim and the extent to which, if necessary, the allegations in the amended complaint relate back to his original complaint.

While the Court does not fault McMorrow for raising this as a ground for summary judgment, the undersigned nonetheless agrees with Bisetti that this issue has already been ruled upon, and none of the arguments raised by McMorrow here leads the Court to reach a different conclusion than before. The crux of McMorrow's position is that Bisetti did not allege the facts underlying his malicious prosecution claim until his amended complaint. Dkt. 96, at 3-4. But as the Court previously concluded, this argument fails to address "the portions of Bisetti's complaint that specifically allege that McMorrow's arrest led Bisetti to be 'unjustly imprisoned for five days' and that as a result of his malicious prosecution, Bisetti 'had to hire multiple lawyers, including criminal defense attorneys.'" Dkt. 67, at 3 (quoting Dkt. 1, at 4-5). The Court further observed that "Bisetti pleaded facts in support of his unlawful-detention and prosecution claims in his original complaint and continued to rely on those allegations during discovery" and that rather than asserting a new

claim, Bisetti's amendment simply "serve[d] to clarify the extent of his claims for relief." *Id.* at 5. For all of these reasons, the Court found that the Bisetti's original complaint put the Defendants on notice of his malicious prosecution claim. *Id.* at 4-6.

The Court disagrees with McMorrow's characterization of Bisetti's pleading as a "tactical choice" to omit his malicious prosecution claim. To the contrary, as noted above, Bisetti has asserted this claim all along. The undersigned granted Bisetti leave to amend his pleading out of an abundance of caution to allow Bisetti to clarify his malicious prosecution claim, but it does not necessarily follow, as McMorrow argues, that Bisetti's original complaint omitted the claim altogether or failed to give McMorrow notice of it. The amendment the Court authorized is just the sort that the Rules explicitly contemplate as relating back to the original complaint: "An amendment to a pleading relates back to the date of the original pleading when … the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(2); *see also McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 102 (5th Cir. 1995) ("Amendments that … serve to expand the facts alleged in the original pleading satisfy the relation back requirements of rule 15(c).").

Moreover, as discussed above, and in the Court's order on the motion for leave to amend, the Fifth Circuit has recognized that "there is no freestanding [federal] constitutional right to be free from malicious prosecution," *Winfrey*, 901 F.3d at 491, and thus McMorrow is incorrect that this component of Bisetti's Fourth Amendment claim had to be asserted as a separate cause of action. Dkt. 67, at 3 n.1. And even if,

as McMorrow argues in his reply, malicious prosecution is a stand-alone cause of action, the Court concludes that the relation-back principles discussed above still save Bisetti from summary judgment on this point.

**B.   The City's Motion for Summary Judgment**

The City challenges the following claims on summary judgment: (1) alleged Fourth Amendment violation by McMorrow; (2) the constitutionality of APD Policy 418; (3) inadequate training claims; (4) inadequate supervision and discipline claims; (5) ratification claim; and (6) damages. Dkt. 85. The Court addresses each in turn.

1.   McMorrow's Alleged Fourth Amendment Violations

The City begins by arguing that, for the reasons asserted in McMorrow's motion for summary judgment, McMorrow's conduct did not violate the Fourth Amendment, and, therefore, the City should not be held liable. Dkt. 85, at 6. Because the Court has concluded that fact questions preclude summary judgment in McMorrow's favor on Bisetti's Fourth Amendment claims, the Court likewise does not grant the City summary judgment on this basis.

2.   Constitutionality of APD Policy 418

Bisetti claims that the City, "acting through its policymakers, including Chief Manley, had a policy, practice, or custom requiring officers to arrest and institute legal process against someone when a complaint of domestic violence is made – even if there was no probable cause for an arrest," in violation of the Fourth Amendment. Dkt. 68, at 7. Bisetti contends that APD Policy 418 is unconstitutional on its face, and

even if the policy itself were facially constitutional, it was implemented with deliberate indifference to his constitutional rights—*i.e.*, a *Monell*[3] claim.

To prevail on his *Monell* claim, Bisetti must show that "(1) an official policy and (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018). "*Monell* plaintiffs [must] establish both the causal link ('moving force') and the City's degree of culpability ('deliberate indifference' to federally protected rights)." *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)); *see also id.* (observing that "where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability"). "In short, a plaintiff must identify the policy, connect the policy to the governmental entity itself, demonstrate deliberate indifference on the part of the policymaker in promulgating the policy, and show that his injury was incurred because of the application of that specific policy." *Cole v. Hunter*, 497 F. Supp. 3d 172, 184 (N.D. Tex. 2020) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984)).

The Court first addresses Bisetti's argument that APD Policy 418 is unconstitutional on its face. *See Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) ("Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

was also aware that a constitutional violation will most likely occur."). The pertinent

portion of APD Policy 418 states:

### 418.2 ENFORCEMENT GUIDELINES

The primary duties of an officer who investigates a family violence allegation, or who responds to a disturbance call that may involve family violence, are to protect any potential victim of family violence and enforce the law by making lawful arrests of violators.

\*\*\*

### 418.2.1 ARREST REQUIREMENT FOR ASSAULTIVE OFFENSES

(a)     Officers are required to make an arrest for incidents involving family violence when:

1.     An assault has occurred that resulted in a minimum of bodily injury or complaint of pain; or where an officer can articulate facts from which a reasonable person could infer that the victim would have felt pain due to:

(a)     The manner in which the suspect made contact with the victim, or

(b)     the nature of observable physical marks on the suspect's body allegedly caused by the suspect's contact with the victim.

2.     The suspect is still on-scene; and

3.     The assault meets the definition of "family violence" or "dating violence."

Dkt. 85-6, at 3.

The City argues that, contrary to Bisetti's claim, this language does not

mandate an arrest in the absence of probable cause, noting that the plain language

of the policy only requires an arrest when an assault has occurred or a reasonable

person could infer that an assault had occurred. Dkt. 85, at 7; Dkt. 109, at 2. Bisetti

contends that APD Policy 418, on its face, requires officers to arrest an individual

accused of domestic violence, irrespective of whether there is probable cause for the crime, Dkt. 104, at 3-6.  In support of this argument, Bisetti points to McMorrow's family-court testimony that "'APD policy is stricter [than Texas law] and states that we shall make an arrest … whenever there is an accusation of family-violence assault.'" *Id.* at 3 (quoting Dkt. 104, at 52[4] (trial testimony)); *see also id.* at 152 (pre-trial testimony)).

The Court agrees with the City. McMorrow's interpretation of the meaning of the language used in APD Policy 418 has no bearing on whether the policy is *facially* constitutional. On its face, the policy only requires an arrest if the officer determines that an assault has occurred or the officer can articulate facts from which a reasonable person could infer that an assault had occurred. Under either scenario, probable cause exists. *Carroll v. Ellington*, 800 F.3d 154, 172 (5th Cir. 2015) ("Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." (quotation

---

[4] The Court notes that Bisetti filed his summary judgment response, along with almost all of its 187 exhibits, as a single, 993-page document (not to mention the sealed, unredacted brief and exhibits, which amounted to hundreds more undifferentiated pages). This, unsurprisingly, made navigating Bisetti's summary-judgment record cumbersome and labor-intensive. The Western District's Administrative Policies and Procedures for Electronic Filing in Civil and Criminal Cases, available on the District's website, states in Section 9(d) that "All documents other than the main document, such as an appendix, exhibit, affidavit, or a supplement, must be submitted as separate PDF documents. Each such document must be given a description that corresponds to the name used in the main document. For example, if the main document refers to 'Exhibit A [Smith Declaration],' the Category must be 'Exhibit' and the Description must be 'A – Smith Declaration.'" This rule ensures that the Court and its staff can easily access records, especially large records like the one here—a worthwhile end that benefits the parties and the Court alike. Future noncompliant filings will be struck with instructions to re-file in accordance with the Rules.

marks omitted)). Bisetti's contention that the policy is facially defective because it uses the phrase "can articulate facts," rather than "spell[ing] out probable cause," Dkt. 104, at 15, does not lead the Court to a different conclusion. *See, e.g.*, *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 (5th Cir. 2016) ("[M]unicipalities are not required to incorporate specific language from our case law, or that of the Supreme Court[.]"). Likewise, the Court does not agree that the language of the policy requires officers to ignore or omit facts that might undermine a probable cause finding, as Bisetti contends, Dkt. 104, at 21-22. Accordingly, the Court concludes that APD Policy 418 is not facially unconstitutional.

Nonetheless, a facially constitutional statute may still run afoul of *Monell* if its enforcement amounts to an official policy promulgated by the municipal policymaker that "was the moving force behind the violation of a constitutional right." *Pena*, 879 F.3d at 621. To prevail on his claim, Bisetti must show "deliberate indifference" on the part of APD toward his constitutional rights, and causation, *i.e.*, that his injury (in this case, his false arrest and malicious prosecution) was incurred because of the application of the specific policy. *Cole*, 497 F. Supp. 3d at 184. Having already concluded that the language of the written policy itself does not require officers to arrest defendants in the absence of probable cause, Bisetti may only prevail on this claim if he can show that the City's practice and custom was to enforce the written policy in a way that required arrests irrespective of the presence of probable cause.[5]

---

[5] The parties do not appear to dispute the question of whether the policy was promulgated by the municipal policymaker. And, because Bisetti "claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving ... issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404.

*Monell*, 436 U.S. at 694. But a custom that has not been formally adopted by the appropriate decisionmaker will only subject the municipality to liability if it is a "persistent and widespread practice." *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001).

As the Fifth Circuit has observed, a pattern or custom amounts to official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.2d at 842. The plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582 (citations omitted). A pattern requires similarity and specificity: "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

A pattern also requires "sufficiently numerous prior incidents," as opposed to "isolated instances." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989). "[O]ne act is not itself a custom." *Pineda v. City of Houston*, 291 F.3d 325, 329

---

Accordingly, the Court's focus here is on the first *Monell* element, *i.e.*, whether the purported no-probable-cause-arrest policy for domestic-violence disputes was indeed an official policy of the City.

(5th Cir. 2002). In *Pineda*, the Fifth Circuit held that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry. *Id.* The court observed that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces." *Id.* (affirming summary judgment in favor of municipality); *see also Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (affirming summary judgment despite plaintiff's reference to 27 separate complaints of excessive force during the relevant period).

In its motion for summary judgment, the City argues that testimony from Chief Manley confirms that neither APD Policy 418 nor its application requires officers to arrest individuals accused of domestic violence without probable cause. Dkt. 85, at 8-10; Dkt. 85-7, at 100 (Chief Manley testifying that "our policy says, you shall make the arrest if an assault occurred[;] the officer has to believe an assault occurred"); *see also id.* at 33-35, 104, 188. In his response, Bisetti zeroes in on the same McMorrow testimony he cited in support of his facial challenge, along with a carefully excised line of testimony from APD Assistant Chief Scott Perry in which he allegedly conceded that officers should ignore facts that might defeat a probable cause determination.[6] Dkt. 104, at 18-19. Bisetti also points to three incidents in which APD officers were allegedly disciplined for declining to arrest individuals under the same circumstances as Bisetti. *Id.*

---

[6] Out of an abundance of caution, Bisetti filed this exhibit under seal and redacted any explicit references to the exhibit in its brief. *See* Dkt. 104, at 4 n.11. The City, however, openly referenced the testimony throughout its Reply Brief, *see* Dkt. 109, at 9, so the Court will do the same here.

But even if McMorrow labored under a misimpression that he was required to make an arrest in a domestic violence case, regardless of the presence of probable cause, that alone does not create an issue of material fact regarding whether the APD as a whole adhered to such a policy. *Pineda*, 291 F.3d at 329. As for Bisetti's reference to Assistant Chief Perry's testimony, which Bisetti contends confirms McMorrow's understanding, the Court agrees with the City that Bisetti's portrayal of this testimony does not accurately reflect the totality of Perry's testimony when viewed in context. As the City points out, Perry stated multiple times during his deposition that the policy language cited by Bisetti is used by officers to determine whether they have probable cause to make an arrest, that the focus of this portion of the policy is on potential evidence that may support probable cause, and that all arrests have to be made with probable cause. Dkt. 104-2, at 115-17. Even when viewed in a light most favorable to Bisetti, this testimony does not raise a fact issue regarding whether APD had a policy, practice, or custom requiring officers to arrest, with or without probable cause, individuals accused of domestic violence. Finally, even if it were true that three APD officers were disciplined for not arresting individuals under circumstances similar to Bisetti's (which Perry contests, Dkt. 104-2, at 92-109), that coupled with McMorrow's and Perry's testimony do not rise to the evidentiary level to raise a fact question regarding a "persistent and widespread practice" of mandating arrests irrespective of probable cause in domestic-violence cases. *Piotrowski*, 237 F.3d at 581. Summary judgment for the City on this point, therefore, is appropriate.

### 3.   Inadequate training

Bisetti claims that "according to Officer McMorrow, APD supervisors instructed him and other APD officers they were to always make an arrest when a complaint of domestic violence is made." Dkt. 68, at 7. Bisetti's amended complaint does not set out additional facts underlying this failure-to-train claim, but essentially, Bisetti alleges that the City failed to properly train its officers in the proper application of APD Policy 418. The City moves for summary judgment on this claim, arguing that Bisetti has no evidence to support his claim that APD's training on its domestic-violence-arrest policy is constitutionally inadequate. Dkt. 85, at 10-12.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To prevail on an inadequate-training claim, the plaintiff must allege with specificity how a city's training program is inadequate. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). The plaintiff must prove that: "(1) [the city's] training policy or procedures were inadequate; (2) [the city] was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused [the plaintiff's injury]." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

Deliberate indifference may be shown in one of two ways. *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 484 (5th Cir. 2014). The first, and more common path, involves proving that the city had notice of a pattern of prior violations which involved events similar to what transpired when the plaintiff's rights were allegedly violated.

*Id.* (citing *Sanders-Burns*, 594 F.3d at 381). Alternatively, the plaintiff can show, based on a single-incident alone, that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Sanders-Burns*, 594 F.3d at 381 (quoting *Estate of Davis*, 406 F.3d at 386). This "single-incident" approach is "difficult, although not impossible," for plaintiffs to establish. *Id.* That is so is because it is not enough for a plaintiff to show that additional training may have avoided the injury; the plaintiff, under either approach, must prove that the training was *so inadequate* that it would pose a "patently obvious risk of recurring constitutional violations." *Kitchen*, 759 F.3d at 485.

In its motion, the City challenges the premise of Bisetti's inadequate-training claim by noting, among other things, that APD's training exceeds the statewide standards set for training new cadets and police officers. Dkt. 85, at 11-12; *see Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) (observing that "compliance with state requirements [i]s a factor counseling against a 'failure to train' finding" (citing *Conner v. Travis Cnty.*, 209 F.3d 794, 798 (5th Cir. 2000))). The City also explains that the APD's comprehensive training program includes training on the domestic-violence-arrest policy, along with training on probable cause and how to prepare a probable cause affidavit for all arrests and offenses. Dkt. 85, at 12 (citing Dkt. 85-8 (declaration of APD's Commander of Recruiting and Training Division)).

33

The City also refers to testimony from Chief Manley that APD's training is consistent with its written policies and that officers are expected to understand and follow the policies. Dkt. 85, at 12 (citing Dkt. 85-7, at 40, 190).

Bisetti first responds that because APD Policy 418 is facially unconstitutional, the training on the policy is also constitutionally deficient. Dkt. 104, at 24. The Court has already rejected this challenge as applied to the policy itself, *supra* Part III.B.2, and the argument is no more compelling in this context. Bisetti also points to language in APD domestic-violence training materials stating that the "'primary duties of an officer who investigates a family violence allegation … are to protect any potential victim … and enforce the law by making lawful arrests of violators.'" Dkt. 104, at 24 (quoting *id.* at 307); that "'officers are required to make an arrest,'" Dkt. 104, at 24 (quoting *id.* at 316); and that "officers shall arrest [a person] for assault … [even] if no physical violence has occurred but circumstances reasonably show further violence is likely to happen,"[7] Dkt. 104, at 24 (quoting *id.* at 318). Bisetti's primary complaint is that these statements in a training PowerPoint do not pepper references to the standard for probable cause throughout. But as Bisetti himself concedes, the presentation, in the context of whether to make multiple arrests, instructs officers to arrest multiple people if "there is adequate and articulable probable cause to believe that each person contributed to the violence." Dkt. 104, at 317. This presentation

---

[7] It is worth noting that for this particular quotation, Bisetti's editing could leave the reader with a mistaken impression that an arrest for assault is required without probable cause. The full quote states "Officers shall arrest for assault by threat or assault by contact if no physical violence has occurred but circumstances reasonably show further violence is likely to happen." Dkt. 104, at 318.

hardly supports Bisetti's claim that the City's training amounted to deliberate indifference towards his rights—quite the opposite.

Bisetti next points to McMorrow's testimony that "the training he received from APD 'caused [him] to understand that APD policy was stricter than the previous policies [he] worked under,'" along with a quote from Chief Manley that the "heart" of McMorrow's issue was his misunderstanding of the policy and that he needed more training on the issue. Dkt. 104, at 27 (quoting *id.* at 177, 104); *see also id.* (quoting Dkt. 104-2, at 118 (McMorrow's supervisor's statement that the department "decided that this was a training issue")). These observations, however, do not raise a fact issue on the City's deliberate indifference when considered in the context of the training materials presented to McMorrow, and the policy itself, both of which the Court has already concluded pass *Monell* muster.

Finally, Bisetti responds that because McMorrow was a police officer whose duties included responding to calls and making arrests, he was "the prototypical 'employee[] [in] need [of] more or different training.'" Dkt. 104, at 28 (quoting *Morris v. Dallas Cnty., Tex.*, 960 F. Supp. 3d 665, 684 (N.D. Tex. 2013)). But McMorrow did receive training, and he received training on the policy that formed the basis for the arrest underlying Bisetti's claim. Bisetti again asserts his false premise that the City trained McMorrow to arrest individuals accused of domestic violence irrespective of the presence of probable cause, but the Court has already rejected that argument.

4.      Inadequate supervision and discipline

To prevail on his failure-to-supervise-or-discipline claim, Bisetti "must (1) identify the individual supervisor who failed to train, supervise, or discipline and (2) demonstrate that the supervisor had subjective knowledge that the police officer posed a serious risk to cause harm." *Roque v. Harvel*, No. 1:17-CV-932-LY, 2020 WL 6334800, at *9 (W.D. Tex. Mar. 23, 2020), *aff'd*, 993 F.3d 325 (5th Cir. 2021); *see also, e.g.*, *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (plaintiff must demonstrate the supervisor(s) "had subjective knowledge of a serious risk of harm to the victims"). As with the other *Monell* claims, a supervisor may be held personally liable for inadequate supervision only where the failure to train or supervise amounts to deliberate indifference and is a proximate cause of a constitutional violation. *See Porter v. Epps*, 659 F.3d 440, 446-47 (5th Cir. 2011) (applying deliberate-indifference standard to failure to promulgate policy, train, and supervise claims); *Gros v. City of Grand Prairie, Tex.*, 34 F. App'x. 150, at *6 (5th Cir. 2002) (per curiam) (requiring a plaintiff to prove deliberate indifference for hiring, training, and supervision claims). A showing of even heightened negligence does not suffice to demonstrate deliberate indifference. *Brown*, 520 U.S. at 407.

In response to the City's motion, Bisetti points to an excerpt from McMorrow's field training record, in which his supervising officer indicated that McMorrow's handling of Bisetti's arrest was a "'Most Satisfactory Performance.'" Dkt. 104, at 25. And Bisetti cites an email sent by McMorrow's supervisor summarizing a 45-minute

follow-up meeting he had with McMorrow in which he discusses topics they addressed. *Id.* at 26 (citing Dkt. 85-9, at 6). Bisetti notes that in the email, the supervisor stated that "'[o]nly credible evidence can be used to build probable cause.'" *Id.* Finally, Bisetti argues that the City's failure to discipline McMorrow after this incident demonstrates its deliberate indifference towards Bisetti's Fourth Amendment rights.

None of this is evidence of deliberate indifference on the part of Bisetti's supervisor or APD as a whole. The evidence cited by Bisetti shows that APD and Bisetti's supervisors took actions to ensure that McMorrow was operating within the law when carrying out a domestic-violence arrest. Bisetti's insistence that APD and, more specifically, his supervisors, instructed him to be deceptive is not borne out by the record; at most, it demonstrates negligence on how his supervisors described the probable cause standard. It does not, however, raise a material question of fact regarding whether APD or McMorrow's supervisors acted with deliberate indifference to his rights.

### 5. Ratification

The City also moves for summary judgment on Bisetti's ratification claim. Dkt. 85, at 14-16; *see* Dkt. 68, at 8 (Bisetti's Amended Complaint, alleging that "the City and APD Chief Manley have ratified McMorrow's false arrest of and wrongful institution of legal process against Bisetti, as McMorrow has not been disciplined, counseled, or terminated despite knowingly arresting Bisetti despite the absence of probable cause"). Bisetti does not directly address this argument in his response;

based on his amended complaint, though, it appears that he relies on the same facts for his ratification claim that he cites in support of his inadequate training, supervision, and discipline claims. For the same reasons stated above, the Court concludes that summary judgment is appropriate as to this claim as well.

      6.    Damages

Having concluded that the City should prevail as a matter of law on the merits of Bisetti's claim, it is unnecessary for the Court to consider the damages argument contained within the City's motion.

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** the City of Austin's motion for summary judgment, Dkt. 85, and **DENIES** Defendant Brendan McMorrow's motion for summary judgment, Dkt. 32, and supplemental motion for summary judgment, Dkt. 96. Finally, the Court **DISMISSES** McMorrow's motion to strike, Dkt. 99, as moot.

SIGNED September 30, 2022.

_____
DUSTIN M. HOWELL
UNITED STATES MAGISTRATGE JUDGE